**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES ("AFGE") Local 1410**
782 Quince Orchard Blvd Apt T2
Gaithersburg, MD - 20878-1515 USA
(County of Residence: Montgomery County)

**AFGE Council 275**
5928 Akin Pl
San Antonio, TX - 78261-2165 USA

**AFGE Council 169**
71 Hummel Ave
Lemoyne, PA - 17043-1945 USA

**AFGE Council 170**
6911 Mesada St
Rancho Cucamonga, CA - 91701-5228 USA

**AFGE Council 171**
14509 Wheeler Road
Maple Heights, OH - 44137-4034 USA

**AFGE Council 172**
308 Somerset Dr
Raeford, NC - 28376-5437 USA

**AFGE Council 235**
815 Columbus Ave Apt 3215
Waco, TX - 76701 USA

**AFGE Council 240**
306 Wiregrass Way
Albany, GA - 31721-7717 USA

**AFGE Council 243**
PO Box 27067
NAS Fort Worth, TX 7612

**AFGE Local 1504**
20223 13TH AVENUE EAST
SPANAWAY, WA - 98387-8125 USA

CASE NO. 1:26-CV-02653

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**AFGE Local 779**
P.O. Box 6099
Sheppard Afb, TX - 76311-0099 USA

**AFGE Local 2449**
6816 Kilchurn Ct
Henrico, VA - 23231-7249 USA

**AFGE Local 54**
P.O. Box 53439
Fort Benning, GA - 31995-1487 USA

**AFGE Local 916**
4713 NE 63rd St
Oklahoma City, OK - 73121-3135 USA

**AFGE Local 987**
P.O. Box 6958
Warner Robins, GA - 31095-6958 USA

**AFGE Local 1592**
4032 W 5050 S
Roy, UT - 84067-8358 USA

**AFGE Local 1658**
Bldg 230 Room 136w
Us Army Tank Auto Command
Warren, MI - 48090 USA

**AFGE Local 1836**
P.O. Box 56304
North Pole, AK - 99705 USA

**AFGE Local 1858**
21950 Natures Cove Dr
Athens, AL - 35613-8710 USA

**AFGE Local 2065**
4124 Gum Branch Rd,
Jacksonville NC, 28540

**AFGE Local 3283**
4485 Ingleside Rd
Cleveland, OH - 44128-3527 USA

**NATIONAL FEDERATION OF FEDERAL EMPLOYEES ("NFFE") Local 178**
Gunpowder Branch
Aberdeen Proving Ground, MD 21010-0178
(County of Residence: Harford County)

**NFFE Local 476**
P.O. Box 625
Aberdeen Proving Ground, MD 21005
(County of Residence: Harford County)

**NFFE Local 639**
2 Hopkins Plaza
Baltimore, MD 21201
(County Of Residence: Baltimore County),

Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF DEFENSE**
1000 Defense Pentagon
Washington, DC 20301,

**PETE HEGSETH**
Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301,

Defendants.

Plaintiffs American Federation of Government Employees ("AFGE") Local 1410, AFGE Council 275, AFGE Council 169, AFGE Council 170, AFGE Council 171, AFGE Council 172, AFGE Council 235, AFGE Council 240, AFGE Council 243, AFGE Local 1504, AFGE Local 779, AFGE Local 2449, AFGE Local 54, AFGE Local 916, AFGE Local 987, AFGE Local 1592, AFGE Local 1658, AFGE Local 1836, AFGE Local 1858, AFGE Local 2065, AFGE Local 3283, National Federation of Federal Employees ("NFFE") Local 178, NFFE Local 476, and NFFE Local 639 file this complaint for declaratory and injunctive relief against the Defendants' termination of collective bargaining agreements ("CBAs") protecting tens of thousands of civilian employees across the Department of Defense ("DoD"). Plaintiffs plead as follows:

## INTRODUCTION

1. This lawsuit challenges the recent directive by Secretary of Defense Pete Hegseth instructing DoD agencies to terminate and repudiate their CBAs and the DoD agencies' implementation of the Secretary's directive.

2. Plaintiffs are labor organizations that represent bargaining units comprising tens of thousands of civilian DoD employees across the county, including in Maryland. Plaintiffs' members include workers who have had continuous union representation for purposes of collective bargaining for more than 50 years—across multiple presidential administrations and during wartime and peacetime alike. Plaintiffs' members have been protected by CBAs that DoD agencies had agreed to follow and that provide these workers with important protections and benefits.

3. On April 9, 2026, Secretary Hegseth issued a Memorandum, purportedly pursuant to President Trump's Executive Order 14251 (March 27, 2025), instructing DoD agencies to

immediately and unilaterally terminate, with only very limited exceptions, all CBAs to which DoD is a party. In the days and weeks that followed, confusion and disruption have ensued as DoD agencies followed Secretary Hegseth's instruction by sending out notices that the agencies were immediately terminating their CBAs, thereby destabilizing workplaces across the country and causing continuing and irreparable harm to DoD unions and their members.

4. Secretary Hegseth's recent action to terminate DoD's CBAs violates the Administrative Procedure Act. DoD continued to honor its CBAs for more than a year after the issuance of EO 14251, and DoD could continue to honor the CBAs now. Yet Secretary Hegseth's April 9, 2026 Memorandum reversed DoD's policy to leave CBAs in place without any reasoned explanation for the reversal and directed that DoD agencies terminate their CBAs within just 24 hours without considering the reliance interests at stake and the chaotic disruptions that predictably resulted. Further, while EO 14251 does not apply to any employees—regardless of occupation—at the "local employing offices" where DoD police officers, security guards, and firefighters serve, DoD agencies acted contrary to law by terminating CBAs at some of those offices for employees who are not police officers, security guards, or firefighters. Because DoD has acted arbitrarily and capriciously and in contravention of law, DoD's actions, including Secretary Hegseth's Memorandum, must be vacated and set aside.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the laws of the United States. This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) and 5 U.S.C. § 702 because the Defendant is a United States agency.

6. The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Plaintiff AFGE Local 1410 represents employees whose place of employment is within the District of Maryland and whose CBAs have been terminated because of Defendants' unlawful actions.

**PARTIES**

8. Plaintiff AFGE Local 1410 is a labor organization and unincorporated association headquartered at 8124 Seneca View Drive, Laytonsville, MD 20882. AFGE Local 1410's members include civilian federal employees and healthcare workers at DoD facilities across the East Coast, including in this judicial district.

9. Plaintiff AFGE Council 275 is a labor organization and unincorporated association that represents thousands of civilian health care workers within the DoD's Defense Health Agency ("DHA").

10. Plaintiff AFGE Council 169 is a labor organization and unincorporated association that represents more than fifteen thousand civilian workers within the DoD's Defense Logistics Agency ("DLA").

11. Plaintiff AFGE Council 170 is a labor organization and unincorporated association that represents more than one thousand civilian workers within the DoD's Defense Contract Management Agency ("DCMA").

12. Plaintiff AFGE Council 171 is a labor organization and unincorporated association that represents civilian workers within the DoD's Defense Finance Accounting Service ("DFAS").

13. Plaintiff AFGE Council 172 is a labor organization and unincorporated association that represents civilian workers within the DoD's Defense Commissary Agency ("DeCA").

14. Plaintiff AFGE Council 235 is a labor organization and unincorporated association that represents civilian workers within the DoD's Army & Air Force Exchange Service ("AAFES").

15. Plaintiff AFGE Council 240 is a labor organization and unincorporated association that represents civilian workers within the DoD's United States Marine Corps, an agency that maintains a global workforce of over 35,000 civilian personnel.

16. Plaintiff AFGE Council 243 is a labor organization and unincorporated association that represents civilian workers at United States Navy bases across the Southeast.

17. Plaintiff AFGE Local 1504 is a labor organization and unincorporated association that represents civilian workers within the DoD's United States Army located at or near Joint Base Lewis-McChord ("JBLM") near Tacoma, WA.

18. Plaintiff AFGE Local 779 is a labor organization and unincorporated association that represents civilian workers located at or near Sheppard Air Force Base in Wichita County, Texas, and who work within DoD agencies including the United States Air Force, DHA, DeCA, and AAFES.

19. Plaintiff AFGE Local 2449 is a labor organization and unincorporated association that represents civilian workers located within DLA, including workers at or near DLA's headquarters in Fort Belvoir, VA.

20. Plaintiff AFGE Local 54 is a labor organization and unincorporated association that represents civilian workers located at or near Fort Benning in Columbus, Georgia, and who work within DoD agencies including the United States Army, United States Navy, Defense Health Agency, Defense Commissary Agency, Defense Finance Accounting Service, and Department of Defense Education Activity.

21. Plaintiff AFGE Local 916 is a labor organization and unincorporated association that represents civilian workers located at or near Tinker Air Force Base in Oklahoma County, Oklahoma, and who work within DoD agencies including the United States Air Force, Air Force Materiel Corps, Defense Health Agency, Defense Logistics Agency, Defense Commissary Agency, Defense Information Systems Agency, and Army & Air Force Exchange Service, as well as non-appropriated fund employees of DoD agencies.

22. Plaintiff AFGE Local 987 is a labor organization and unincorporated association that represents civilian workers located at or near Robins Air Force Base in Houston and Peach Counties, Georgia, and who work within DoD agencies including the United States Air Force, Air Force Materiel Corps, Defense Health Agency, Defense Logistics Agency, Defense Commissary Agency, and Army & Air Force Exchange Service, as well as non-appropriated fund employees of DoD agencies.

23. Plaintiff AFGE Local 1592 is a labor organization and unincorporated association that represents civilian workers located at or near Hill Air Force Base in Davis County, Utah, and who work within DoD agencies including the Air Force Materiel Corps, Defense Logistics

Agency, Defense Commissary Agency, Defense Information Systems Agency, and Army & Air Force Exchange Service, as well as non-appropriated fund employees of DoD agencies.

24. Plaintiff AFGE Local 1658 is a labor organization and unincorporated association that represents civilian workers located at or near the Detroit Arsenal and Selfridge Air National Guard Base in Macomb County, Michigan and who work within DoD agencies including the United States Army, Defense Logistics Agency, and Defense Commissary Agency.

25. Plaintiff AFGE Local 1836 is a labor organization and unincorporated association that represents civilian workers located at or near Eielson Air Force Base in Fairbanks North Star Borough, Alaska, and who work within the DoD's United States Air Force.

26. Plaintiff AFGE Local 1858 is a labor organization and unincorporated association that represents civilian workers located at or near Redstone Arsenal in Madison County, Alabama, and who work within DoD agencies including the United States Army, Defense Health Agency, Defense Logistics Agency, Defense Commissary Agency, and Army & Air Force Exchange Service, as well as non-appropriated fund employees of DoD agencies.

27. Plaintiff AFGE Local 2065 is a labor organization and unincorporated association that represents civilian workers located at or near Marine Corps Base Camp Lejeune in Onslow County, North Carolina, and who work within DoD agencies including the United States Navy, United States Marine Corps, Defense Health Agency, Defense Commissary Agency, Department of Defense Education Activity, as well as non-appropriated fund employees of DoD agencies.

28. Plaintiff AFGE Local 3283 is a labor organization and unincorporated association that represents civilian workers located at or near DFAS Cleveland in Cuyahoga County, Ohio, and who work within DoD agencies including the United States Navy and Defense Finance Accounting Service.

29. Plaintiff NFFE Local 178 is a labor organization and unincorporated association that represents more than 1,000 civilian workers employed by DoD, including but not limited to: employees of the U.S. Army 20th CBRNE Command, CBRNE Analytical and Remediation Activity located at Aberdeen Proving Ground, Maryland; employees of the U.S. Army Combat Capabilities Development Command Headquarters located at Aberdeen Proving Ground, Maryland; employees of the U.S. Army Combat Capabilities Development Command – Chemical Biological Center located at Aberdeen Proving Ground, Maryland; employees of the U.S. Army Combat Capabilities Development Command – Chemical Biological Center located at Pine Bluff, Arkansas; employees of the U.S. Army Contracting Command, Aberdeen Proving Ground located at Aberdeen Proving Ground, Maryland; and employees of the U.S. Army Contracting Command located at the Research Triangle Park Division in Raleigh-Durham, North Carolina.

30. Plaintiff NFFE Local 476 is a labor organization and unincorporated association that represents about 1,500 civilian processionals employed at the Aberdeen Proving Ground in Maryland by the United States Army Command, Control, Communications, Computers, Cyber, Intelligence, Surveillance, and Reconnaissance ("C5ISR") Center and the United States Army Communication Electronics Command ("CECOM").

31. Plaintiff NFFE Local 639 is a labor organization and unincorporated association that represents a bargaining unit of about 610 civilian employees of the U.S. Army Corps of Engineers, Baltimore District.

32. Defendant United States Department of Defense ("DoD") is a federal agency headquartered at the Pentagon in Arlington County, Virginia. 5 U.S.C. §§ 101, 105. The DoD is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 551, 701(b)(1),

and within the meaning of the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7103(a)(3).

33. Defendant Pete Hegseth is sued in his official capacity as the U.S. Secretary of Defense. He ordered the CBA terminations at issue in this lawsuit.

## FACTUAL ALLEGATIONS

### A. Congress provided collective bargaining rights for federal workers.

34. On January 17, 1962, President Kennedy signed Executive Order 10988, titled "Employee-Management Cooperation in the Federal Sector." The order recognized the right of federal workers—including federal civilian workers at DoD—to engage in collective bargaining. Even prior to the issuance of that Executive Order, and prior to the creation of DoD, some agencies that became part of DoD had engaged in collective bargaining with unions. For many decades, the DoD has successfully functioned with the understanding that its mission is compatible with collective bargaining rights. DoD agencies have engaged in collective bargaining with bargaining units of civilian workers during the Vietnam War, the Cold War and the fall of the Soviet Union, 9/11 and the War on Terror, as well as during the war in Afghanistan, the longest war the United States has ever fought.

35. Federal employee collective bargaining rights were codified and refined by Congress with the enactment of the Civil Service Reform Act of 1978, which included the Federal Service Labor-Management Relations Statute (FSLMRS). The FSLMRS, P.L. No. 95-454, 92 Stat. 1111, 1191-1216 (1978), establishes a framework to govern collective bargaining with federal government agencies. *See* 5 U.S.C., ch. 71.

36. In the FSLMRS, Congress found that statutory protection of collective bargaining rights for federal employees "safeguards the public interest," "contributes to the effective

conduct of public business," and "facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1). The FSLMRS grants "[e]ach employee" the "right to form, join, or assist any labor organization … freely and without fear of penalty or reprisal," and requires that "each employee shall be protected in the exercise of such right." Those rights include the right "to act for a labor organization in the capacity of a representative," as well as "to engage in collective bargaining with respect to conditions of employment[.]" *Id.* § 7102.

37. Agencies subject to the FSLMRS must "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election." 5 U.S.C. § 7111(a). A labor organization recognized in this manner "is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit." 5 U.S.C. § 7114(a)(1). The statute further provides that "[a]ny agency and any exclusive representative in any appropriate unit in the agency, through appropriate representatives, shall meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement." 5 U.S.C. § 7114(a)(4).

38. Agencies' bargaining obligations under the FSLMRS include, among others, the obligation to bargain in good faith, to provide information to the union upon request, and "if agreement is reached, to execute on the request of any party to the negotiation a written document embodying the agreed terms, and to take such steps as are necessary to implement such agreement." 5 U.S.C. § 7114(b). Agencies are prohibited from engaging in unfair labor practices, *id.* § 7116, and are required to process grievances raised by the union, *id.* § 7121. If an employee in a bargaining unit submits a voluntary written authorization for the agency to deduct

membership dues from that employee's pay, the agency is required to honor and implement that request. *Id.* § 7115(a).

39. The DoD is an executive "agency" subject to the requirements of the FSLMRS. 5 U.S.C. § 7103(a)(3).

40. The FSLMRS provides that the President "may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines" both that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that "the provisions [of the FSLMRS] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

**B. Executive Order 14251**

41. On March 27, 2025, President Trump issued Executive Order 14251 ("EO 14251" or "the EO"). This EO purported to exercise the authority vested in the President under 5 U.S.C. § 7103(b)(1) to exclude agencies and subdivisions from the FSLMRS's scope, purportedly in order "to enhance the national security of the United States." As relevant here, the EO declared that, although DoD agencies had been engaged in collective bargaining under the FSLMRS for more than 45 years, the FSLMRS "cannot be applied" to DoD "in a manner consistent with national security requirements and considerations." EO 14251, §1.

42. The EO also stated that, "[n]otwithstanding the forgoing [sic], nothing in this section [which otherwise excluded DoD from the coverage of the FSLMRS] shall exempt from the coverage" of the FSLMRS "the immediate, local employing offices of any agency police officers, security guards, or firefighters…." EO 14251, § 2.

43. Finally, as relevant here, the EO delegated authority to the Secretary of Defense to issue orders suspending the application of the EO "to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the [FSLMRS]." EO 14251, § 4(a). To exercise such delegated authority, the Secretary was required to issue an order within 15 days of the EO certifying to the President that the provisions of the FSLMRS "can be applied to such subdivision in a manner consistent with national security requirements and considerations." EO 14251, § 4(b).

44. The EO instructed that "[t]his order shall be implemented consistent with applicable law[.]" EO 14251, § 8(b).

45. The legality of the EO is being challenged in many lawsuits across the country. Although some district courts determined that the EO is likely unlawful, no injunction is currently in place barring its implementation by DoD against the Plaintiff unions' bargaining units. This lawsuit does not challenge the legality of the EO, only actions taken by Defendants after the EO was issued that the EO did not require them to take.

**C. Department of Defense's Initial Response to the EO**

46. On April 23, 2025, DoD published a notice in the Federal Register in which Secretary Hegseth purported to exercise the authority delegated by EO 14251 to conclude that the provisions of the FSLMRS "can be applied to the following federal wage system employees in the trades at the following DoD component subdivisions in a manner consistent with national security requirements and considerations." The four subdivisions identified were (a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army; (b) Air Force Test Center, Air Force Materiel Command, Department of Air Force; (c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force; and (d) Fleet Readiness Center

Southeast. Secretary Hegseth did not exclude any other subdivisions from the operation of the EO.

47. Although Secretary Hegseth had not excluded other subdivisions from the scope of EO 14251, DoD did not terminate its existing CBAs as to other subdivisions. DoD agencies continued throughout 2025 and early 2026 to leave in place CBAs at DoD facilities across the United States, and DoD did not refuse to recognize labor organizations as the representatives of employees within their bargaining units.

48. EO 14251 did not terminate existing CBAs or require agencies to immediately terminate existing CBAs. Rather, the EO provides for actions to be taken by "each applicable agency head … upon termination of the applicable collective bargaining agreement." EO 14251, §6. DoD recognized that DoD could, and did, continue to honor the CBAs to which DoD was a party.

49. At first, DoD's conduct in implementing EO 14251 appeared at least partially consistent with guidance documents issued by the Office of Personnel Management (OPM). On April 8, 2025, OPM published a guidance document concerning "Frequently Asked Questions" with respect to the EO. That document stated that "[a]gencies should *not* terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination." (Emphasis supplied). On or around August 14, 2025, OPM revised this guidance to state instead that "[a]gencies may *choose* to terminate, abrogate, or repudiate CBAs … and should consult with their General Counsels to assess next steps regarding those CBAs." *AFGE v. Trump*, No. 25-4014, Dkt. No. 34.1 at 2 (9th Cir. Aug. 14, 2025) (emphasis added). Notwithstanding this guidance, DoD did not purport to terminate "terminate, abrogate, or repudiate CBAs" at that time. Then, on February 12, 2026, OPM issued yet another guidance document, this time opining

that agencies should "proceed to terminate or modify CBAs in order to fully comply with [the EO]." Feb. 12, 2026 OPM Memo at 1. But OPM does not have authority to run DoD. DoD did not immediately terminate its CBAs.

**D. Secretary Hegseth's Memorandum**

50. On April 9, 2026, however, the Department of Defense executed an unexplained U-turn in its labor relations policy. On that date, Secretary Hegseth circulated a two-paragraph Memorandum that tersely "direct[ed] the termination of all collective bargaining agreements to which the Department is a party, not subject to a court order enjoining implementation of [the EO]." Furthermore, Secretary Hegseth ordered that the terminations must occur "within 24 hours of the date of this Memorandum," except as to the employees' listed in the Secretary's April 23, 2025 certification and as to "the local employing offices of any agency police offices, security guards, or firefighters."

51. The Memorandum offered no explanation for the timing of the Secretary's decision.

52. The Memorandum also failed to consider any alternatives to the termination of all collective bargaining agreements to which the DoD was a party or with respect to the timing of such terminations and failed to consider Plaintiffs' reliance interests in their CBAs.

53. The *only* explanation given by the Secretary for the reversal in DoD's position was that "[t]his action is required to align agency operations with national security requirements as outlined in [the EO]," and that "[a]gencies and subdivisions identified in sections 2 and 3 of EO 14251 have been determined to perform functions incompatible with the continued application of 5 U.S.C., chapter 71." But the EO had been issued a year earlier and the legality of the EO is still being disputed in multiple court cases. The Secretary did not explain why DoD

was suddenly changing course about CBAs more than a year after issuance of the EO or why CBAs could not remain in effect until the conclusion of litigation regarding the EO or until the CBAs expire on their own terms.

54. The Hegseth Memorandum concluded by stating that the "Under Secretary of War for Personnel and Readiness" would "issue supplemental guidance to facilitate a smooth transition," and advising that "[l]eadership at all levels must coordinate closely with their respective Offices of General Counsel and human resources representatives to ensure full compliance."

**E. CBA Terminations and Resulting Chaos**

55. Notwithstanding Secretary Hegseth's vision of a "smooth transition," the predictable result of his Memorandum has been the opposite: chaos. In the wake of his Memorandum, DoD agencies have been notifying unions of the termination of CBAs at facilities across the country, with little or no plan for how these workplaces will function smoothly without the close coordination between DoD agencies and union leadership that has kept DoD's vast operations running for decades.

56. DoD did not have any uniform process for implementing the termination of CBAs, and in many cases there was virtually no notification or communication at all about what actions were being taken, if any. Some local union leaders were informed by phone that their unions' CBAs were being terminated; others were informed by email, or by letter; others received no communications at all—their agency counterparts just went "radio silent," or started refusing to answer routine questions. Beyond these "official" notifications (or lack thereof), Secretary Hegseth's Memorandum begat a firestorm of confusion and misinformation at facilities nationwide—about who still did or did not have collective bargaining agreements, and why, and

since when. Especially perniciously, managers across the country immediately began telling workers that "the union doesn't exist anymore"—a completely false message (since unions are private membership organizations the government has no power to disband) that continues to cause severe confusion and harm to unions and workers alike. Since Secretary Hegseth's Memorandum, union officials describe these false official communications and statements about their unions as taking place "constantly, everywhere, everyday."

57. Defendants' termination of Plaintiffs' CBAs substantially impairs Plaintiffs' ability to fulfill their core functions and threatens Plaintiffs' continued viability as organizations.

58. Plaintiffs' CBAs provide covered employees with substantive employment protections (*e.g.*, provisions regarding work schedules and leaves) and also provide for a grievance process that can be used by employees and for which employees are entitled to union representation. CBAs also require the employer to meet and negotiate with the union prior to implementing new policies that affect terms and conditions of employment. CBAs also provide employees with the right to union representation during the disciplinary process, including in meetings with the employer that can lead to discipline. CBAs also allow union representatives official time during which they can represent bargaining unit members, and CBAs provide the union with office space and access to office equipment so unions can perform their functions. Many CBAs provide for union representation on health and safety committees that create policies to protect employees. Many CBAs also provide that the employer must consult with the union before implementation of a reduction in force and address reduction-in-force procedures. CBAs also typically provide that employees are entitled to engage in union activities without employer reprisal and protect employees' right to engage in lawful activities on their personal time.

59. Since the Hegseth Memorandum, DoD agencies are not accepting grievances under the CBAs, thereby leaving employees in indefinite limbo, preventing Plaintiffs from performing one of their core functions, and leaving disputes about working conditions and other critical matters unresolved.

60. Without the ability to file new grievances with the potential for resolution with an impartial arbitrator, workers have lost a powerful tool for challenging discriminatory treatment, improper or unfair conduct, overly harsh discipline, and other matters critical to the fair and successful functioning of the Department of Defense. At one Army facility, for example, an employee was recently put on a "Performance Improvement Plan" that appears both discriminatory and a transparent prelude to termination—yet because her CBA was purportedly terminated, she now has no recourse to challenge the Performance Improvement Plan or assert her rights.

61. For decades, DoD employees have raised work-related issues and sought to improve their workplaces by bringing concerns to the attention of their unions, which can investigate, provide resources, gather information, provide representation such as presenting grievances, and bargain collectively. Since Secretary Hegseth's Memorandum, however, DoD employees are being told that their CBAs do not exist and that their unions are powerless, and there are no equivalent avenues for workers to raise problems, highlight discriminatory treatment or improper conduct, obtain information about their workplace, or seek guidance regarding how to handle workplace issues.

62. DoD employees have also been denied their right to have a union representative present during any investigatory interview or formal discussion conducted by management. In some cases, DoD employers have issued discipline against employees merely for attempting to

assert their rights. For example, one DoD employee was recently issued formal discipline for taking a phone call she expected was investigatory alongside her union representative. DoD took the position that because of a union representative's presence on the phone call, the employee had wrongly disclosed confidential information to "non-authorized personnel"—even though the employee was simply exercising a basic right that has been established for over fifty years.

63. Since Secretary Hegseth's Memorandum, DoD agencies have eliminated official time required by CBAs, severely hamstringing union officers from supporting or representing their members. In one absurd instance, a union president was recently reprimanded even for spending time dismantling the union office (on DoD's orders) rather than being at his jobsite. Because Defendants are now refusing to provide contractually mandated official time during work hours, union representatives have been unable to provide representation when employees most need it and often must forgo providing representation altogether.

64. Union officers continue to have substantial obligations to fulfill to carry out the unions' missions, including but not limited to representing members at the Merit Systems Protection Board, the Equal Employment Opportunity Commission, and the Defense Office for Hearings and Appeals; providing support for workers compensation claims and reasonable accommodation requests; fulfilling all representation functions for police officers, security guards, and firefighters whose CBA rights are still being honored; and much more. The immediate termination of CBA-provided official time prevents union officers from performing those obligations.

65. Since Secretary Hegseth's Memorandum, DoD agencies have been ordering unions to vacate the office space guaranteed by the CBAs, causing significant disruptions that

prevent the unions from serving or communicating effectively with members about the wave of changes at DoD.

66. As a result of Secretary Hegseth's Memorandum, the termination of CBAs, and the cascade of harms described above that have flowed directly from those actions, Plaintiffs have seen significant drops in dues-paying members—a harm that is only accelerating with time. This loss of membership weakens the strength of the unions and severely inhibits Plaintiffs from fulfilling their functions as worker-empowerment organizations.

67. As a result of Secretary Hegseth's Memorandum, some DOD agencies are informing Plaintiff's bargaining unit workers that they have been coded as "not eligible to join a union" in their personnel records, thereby inhibiting workers from becoming or remaining union members. Many workers are now afraid to participate in any union activities.

68. By preventing Plaintiffs from fulfilling their representational functions, DoD's actions have also harmed and continue to harm Plaintiffs' reputation, trust, and goodwill in the eyes of their members and potential members, many of whom now question whether Plaintiffs can continue to help them. Thus, Plaintiffs are experiencing ongoing harm to their abilities both to retain existing members and to organize new union members, creating an existential threat to the unions' existence.

69. In addition to the many harms flowing from Secretary Hegseth's Memorandum and the resulting terminations of CBAs generally, DoD agencies have also terminated CBAs for employees who are not covered by the EO. The EO provides that the "local employing offices of any agency police officers, security guards, or firefighters"—not just workers who are police officers, security guards or firefighters—remain subject to the FSLMRS. EO 14251 ¶ 2. DoD, in both the Hegseth Memorandum and the DoD "implementation instructions," acknowledged that

this means that DoD must continue honoring the collective bargaining rights not only of police officers, firefighters, and security guards, but also of other employees in the same "immediate local employing offices." DOD Implementation Instructions for Termination of Collective Bargaining Agreements §2.1. Yet DoD failed to prepare any list of subdivisions that are not covered by the EO because they employ police officers, firefighters or security guards before issuance of the Hegseth Memorandum, nor did the Hegseth Memorandum provide for such a list to be created before implementation of the Memorandum. Instead, the Memorandum directed DoD agencies to terminate CBAs within 24 hours.

70. Thus, across DoD, subdivisions have declared that employees who work alongside police officers, firefighters, and security guards—workers in the same "local employing office" within the meaning of the EO—no longer have the protections of their CBAs or any rights under the FSLMRS, in direct contradiction of the EO. Dispatchers who work alongside police officers and provide critical services enabling those officers to do their jobs; IT professionals who keep agency fire departments running; administrative staff who support offices containing security guards—all have been denied their collective bargaining rights. At DLA's Susquehanna Defense Distribution Center in New Cumberland, Pennsylvania, for example, the same local employing office that employs police officers, firefighters, and security guards also employs many other types of employees. Yet DLA treats these other types of employees as having lost all the rights guaranteed to them under the FSLMRS and their existing CBAs due to DoD's systematic failure to implement the EO according to its terms. These failures are the entirely predictable result of Secretary Hegseth's decision to demand the immediate termination of CBAs in a 24-hour period without reason or explanation or the creation of a list of excluded subdivisions—a recipe for chaos and harm to workers.

## FIRST CAUSE OF ACTION

***Violation of the Administrative Procedure Act – Arbitrary and Capricious***

71. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

72. Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), a reviewing agency shall "hold unlawful and set aside agency actions, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

73. Secretary Hegseth's April 9, 2026 Memorandum, and DoD's actions implementing Secretary Hegseth's April 9, 2026 Memorandum, as described in this Complaint and including but not limited to the termination of CBAs, constitute final agency action under the APA.

74. The Memorandum and implementing actions, including but not limited to the CBA terminations, are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under § 706(2)(A) for several reasons.

75. *First*, Secretary Hegseth's April 9, 2026 Memorandum constitutes a major change in DoD's position that has not been rationally explained. For nearly a year after the issuance of EO 14251, DoD continued its longstanding policy of honoring the CBAs into which it has entered. The DoD's April 9, 2026 decision to terminate those CBAs within 24 hours irrationally and improperly failed to explain why the DoD would no longer honor existing CBAs, or why termination was necessary within 24 hours notwithstanding the agency's prior honoring of CBAs and the predictable chaos that would result from DoD's abrupt reversal. DoD also failed to consider relevant reliance interests as required by the APA. Nor did DoD explain why the obvious alternatives of maintaining the CBAs until litigation about the EO has run its course or

allowing CBAs to expire by their own terms (both of which would have been far less disruptive) were not chosen.

76. *Second*, Secretary Hegseth's action was also arbitrary and capricious because there was no good reason for DoD—having left CBAs in effect for more than a year after issuance of the EO—to terminate them when it did rather than at an alternative time, such as after litigation about the validity of the EO concludes or after their natural expiration.

77. *Third*, DoD's CBA terminations have failed to follow the plain text of Section 2 of EO 14251, which states that "nothing in this section shall exempt from the coverage of Chapter 71…the immediate, local employing offices of any agency police officers, security guards, or firefighters." Notwithstanding that command, DoD has taken action to deny rights to thousands of employees at the "immediate, local employing offices" of DoD police officers, security guards, or firefighters, while continuing to honor the agency's CBAs with respect only to certain individual police officers, security guards, and firefighters. That DoD has continued to acknowledge some employees' rights while denying rights to other similarly situated DoD employees in the same "local employing offices" is evidence that DoD's classifications are arbitrary and capricious. Furthermore, DoD acted arbitrarily and capriciously by directing DoD agencies to immediately terminate CBAs without DoD first preparing a list of the subdivisions that are not covered by the EO (i.e. the subdivisions that are "local employing offices" of police officers, security guards, or firefighters), leading predictably to widespread confusion and arbitrary enforcement of the Memorandum.

## SECOND CAUSE OF ACTION

***Violation of the Administrative Procedure Act – Exceeds Statutory Authority***

78. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

79. Under section 5 U.S.C. § 706(2)(C) of the APA, a court shall hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

80. DoD has no freestanding authority to exempt its employees from the coverage of Chapter 71 of Title 5 of the United States Code. Any such authority derives from the authority conferred by Congress on the President by 5 U.S.C. § 7103(b). The President purported to exercise this authority in EO 14251, which is not being challenged by this lawsuit. The EO states that "nothing in this section [which exempts DoD agencies from the coverage of Chapter 71] shall exempt from the coverage of Chapter 71…the immediate, local employing offices of any agency police officers, security guards, or firefighters." Thus, the EO leaves the entire "local employing offices" within the coverage of Chapter 71, not just particular types of employees within those offices.

81. Nevertheless, DoD has purported to exercise authority it does not possess by purporting to terminate CBAs and denying Chapter 71 rights with respect to thousands of employees at the local employing offices of police officers, security guards, and firefighters. By failing to follow the plain terms of Section 2 of EO 14251, DoD has acted in excess of any authority purportedly delegated to it by the President and in contravention of Chapter 71.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

82. Declare that the directive set forth in Secretary Hegseth's April 9, 2026 Memorandum was unlawful;

83. Enter preliminary or permanent injunctive relief setting aside the April 9, 2026 termination directive as unlawful, including by requiring reinstatement of all CBAs terminated pursuant to that directive and prohibiting DoD from taking further actions implementing the directive;

84. Direct Defendants to issue guidance to all their officers, employees, contractors, and agents to rescind the terminations of the CBAs and to abide by their terms;

85. Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as appropriate;

86. Grant such other and further relief as the Court deems just and proper.

Dated: July 20, 2026

Respectfully submitted,

By: /s/Scott Kronland

Lauren J. Kelleher (Bar No. 22134)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21201
(410) 962-1030 Office
(410) 385-0869 Fax
lkelleher@browngold.com

Scott A. Kronland
Jonathan Rosenthal
James Baltzer
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 Office
skronland@altber.com
jrosenthal@altber.com
jbaltzer@altber.com

Attorneys for Plaintiffs