**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 1410, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, *et al.*,<br><br>Defendants. | CASE NO. 1:26-cv-02653-SAG |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY**

Plaintiffs respectfully submit the attached Memorandum and Order issued on September 29, 2026 in *National Council of Prison Locals v. Federal Bureau of Prisons*, Case No. 25-CV-1907 (D. Conn.) as supplemental authority in support of Plaintiffs' Renewed Motion for a Preliminary Injunction and 5 U.S.C. § 705 Stay (ECF 29).

The attached Memorandum and Order grants unions' motion for a preliminary injunction and 5 U.S.C. § 705 stay to require the Bureau of Prisons ("BOP") to reinstate a collective bargaining agreement that BOP terminated after issuance of Executive Order 14,251. The district court concluded that the unions were likely to succeed on their claim that BOP's termination of the CBA was arbitrary-and-capricious action that violated the Administrative Procedure Act; that the unions would suffer irreparable harm absent preliminary relief; and that the balance of equities and public interest favored a preliminary injunction. Many of the issues addressed in the Memorandum and Order are also presented here by Plaintiffs' pending motion.

Dated: September 30, 2026

Respectfully submitted,

By: /s/Scott A. Kronland

Lauren J. Kelleher (Bar No. 22134)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21201
(410) 962-1030 Office
(410) 385-0869 Fax
lkelleher@browngold.com

Scott A. Kronland (admitted *pro hac vice*)
James Baltzer (admitted *pro hac vice*)
Jonathan Rosenthal (admitted *pro hac vice*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 Office
(415) 362-8064
skronland@altber.com
jbaltzer@altber.com
jrosenthal@altber.com

*Attorneys for Plaintiffs*

# ATTACHMENT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATIONAL COUNCIL OF PRISON LOCALS, *et al.*,

Plaintiffs,

-against-

FEDERAL BUREAU OF PRISONS, *et al.*,

Defendants.

**MEMORANDUM & ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RELIEF UNDER 5 U.S.C. § 705**

3:25-CV-1907 (VDO)

**VERNON D. OLIVER**, United States District Judge:

On March 27, 2025, President Donald Trump signed Executive Order 14,251 ("EO 14,251"), which excluded the Department of Justice ("DOJ") and its member agencies, including the Federal Bureau of Prisons ("BOP") from their previously statutorily protected right to collective bargaining. Nevertheless, for nearly six months after the issuance of EO 14,251, BOP continued to uphold and substantially comply with the collective bargaining agreement (the "CBA") it held with National Council of Prison Locals, American Federation of Government Employees ("CPL-33"). This arrangement continued until September 25, 2026, when BOP Director William K. Marshall III chose to terminate the CBA for a reason unrelated to national security: because, as he stated, CPL-33 is not the "kind of union" he supports. Although BOP stated that the termination was based on EO 14,251,[1] Director Marshall posted a Message from the Director on the BOP website that same day, claiming that

[1] Ex. 2 to PI Motion, ECF No. 28-5 at 2.

the "whole purpose of ending this contract" was because the "union [was] an obstacle to progress" and "the current contract has too often slowed or prevented changes."[2]

This case does not concern the validity of EO 14,251—that litigation is ongoing elsewhere throughout the nation. Rather, the immediate issue before the Court is whether, as is alleged, BOP's decision to terminate the CBA violated the Administrative Procedures Act ("APA") such that CPL-33 and its affiliate, American Federation of Government Employees Local 1661 ("Local 1661") (collectively, "Plaintiffs"), are entitled to a preliminary injunction and preliminary relief under 5 U.S.C. § 705. For the following reasons, the Court agrees, and finds that Plaintiffs have met their burden of demonstrating the likely merit of their claim that the September 25, 2025, termination of the CBA violated the APA; that the termination caused irreparable harm to Plaintiffs and the thousands of members Plaintiffs represent; and that the public interest and balance of the equities weigh in favor of preliminary relief.

Accordingly, Plaintiffs' motion for preliminary injunction and preliminary relief under 5 U.S.C. § 705 (the "PI Motion") is **GRANTED**. The September 25, 2025, termination of the CBA is preliminarily set aside and enjoined. Defendants shall immediately reinstate the CBA for the remainder of the agreed-upon term provided in the CBA, and shall be governed by the terms of that agreement. Defendants shall also reinstate any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the CBA.

---

[2] Ex. 3 to PI Motion, ECF No. 28-6 at 2–3.

# I. BACKGROUND

## A. Factual Background

### 1. The Parties

CPL-33 represents a bargaining unit of approximately 30,000 civil servants who work for BOP.[3] Its members are correctional officers, case managers, psychologists, and other BOP employees who are responsible for maintaining the safety and security of inmates, staff, and BOP institutions.[4] CPL-33 evolved from labor organizations that had represented federal correctional institution employees since the 1940s.[5] Under its current name, CPL-33 has been the exclusive bargaining representative for BOP employees since 2006.[6]

CPL-33's mission is to advocate for and promote the interests of its bargaining unit members in their federal employment.[7] The union's core functions are: (1) collectively bargaining with BOP to obtain a fair and reasonable collective bargaining agreement; (2) filing and negotiating grievances against BOP to enforce the terms of the CBA; (3) pursuing arbitration on behalf of its members to enforce the CBA; (4) providing trainings to constituent locals, like Local 1661; and (5) providing support, guidance, and resources to its members.[8] CPL-33 is also active in advocating for its members before Congress to seek greater safety measures for staff and inmates, improved working conditions, and increased staffing and pay.[9]

---

[3] White Decl., ECF No. 28-2 ¶ 4.

[4] *Id.*

[5] *Id.*

[6] Compl., ECF No. 1 ¶ 13.

[7] ECF No. 28-2 ¶ 5.

[8] *Id.*

[9] *Id.*

Local 1661 is a member union of CPL-33.[10] It represents approximately 200 civil servants who work for BOP in Danbury, Connecticut.[11] As a local affiliated chapter of CPL-33, Local 1661 is not a signatory to the CBA (or its amendments and modifications),[12] but it nevertheless operates under the CBA that CPL-33 negotiates with BOP.[13] It also enters into separate agreements that govern operations at FCI Danbury.[14] Like CPL-33, Local 1661's mission is to advocate for the interests of its members in their federal employment.[15] It collectively bargains with BOP to outline local safety and security procedures and to negotiate conditions of employment for its members.[16] It also files grievances and pursues arbitration against BOP to enforce the conditions of the CBA.[17] For instance, Local 1661 recently negotiated a settlement under the CBA that corrected BOP's failure to pay its staff for certain overtime hours they worked.[18] Because of the CBA, each Local 1661 member received compensation under the settlement agreement without having to file individual complaints with BOP for corrected pay.[19]

BOP is a component of the United States Department of Justice. It employs approximately 35,000 employees, the majority of whom are designated as federal law

---

[10] Curnan Decl., ECF No. 28-3 ¶ 4.

[11] *Id.*

[12] Hemingway Decl., ECF No. 40-2 ¶ 7.

[13] ECF No. 28-3 ¶ 5.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 7.

[19] *Id.*

enforcement officers, and operates 122 prisons located within the United States and Puerto Rico.[20] William K. Marshall III is sued in his official capacity as the director of BOP.[21]

### 2. The CBA

The most recent collective bargaining agreement, the CBA, was originally negotiated and signed in July 2014.[22] Most recently, on November 1, 2024, BOP and CPL-33 entered into a revised CBA that extended the term through May 28, 2029.[23] The CBA defines the rights of CPL-33 and its members across a variety of situations, ranging from establishing employee rights, to defining the relationship between the CPL-33 and BOP, and outlining how the union and agency engage on policy issues.

For employees, the CBA addresses how and where staff are assigned to work, their work schedule (including lunch breaks and time off), and the circumstances under which they can be mandated to work overtime.[24] It also specifies the steps BOP must take to ensure the health and safety of its employees, such as measures the agency must implement to abate asbestos and lead paint.[25] Employees are also guaranteed the right to union representation in investigatory examinations that may result in discipline, as well as union assistance in filing a

---

[20] ECF No. 40-2 ¶ 2.

[21] ECF No. 1 ¶ 17.

[22] ECF No. 28-2 ¶ 7.

[23] *Id.*

[24] *Id.* ¶ 13.

[25] *Id.* ¶ 17.

formal grievance.[26] During the formal grievance process, the union has a right to be present at any discussions with BOP, and grievances must be resolved in accordance with the CBA.[27]

The CBA also establishes how CPL-33, Local 1661, and BOP interact with each other, particularly as it applies to negotiations on issues of policy. Article 2 guarantees that CPL-33 and BOP officials will meet four times a year on issues of national concern and recommends that local union affiliates meet with local agency officials monthly.[28] At the national and local levels, these meetings have concerned issues such as employee uniforms, respiratory contaminants, and the provision of safety equipment.[29] The CBA enshrines the right of CPL-33 to present its views to BOP officials and Congress, and it protects employees from reprisal for expressing their views to management officials or Congress.[30]

The CBA further establishes the purposes and procedures for which union representatives may use "official time."[31] This refers to the time that union representatives may use on union activities when they would otherwise be on official-duty status.[32] The CBA provides that union representatives may use official time to engage in grievance proceedings and arbitrations, meet with employees to address workplace concerns, negotiate with BOP on issues affecting employees and inmates, and represent CPL-33's positions to BOP officials.[33]

[26] *Id.* ¶ 14.

[27] *Id.*

[28] *Id.* ¶ 9.

[29] *Id.*

[30] *Id.* ¶ 16.

[31] *Id.* ¶¶ 10–11.

[32] *See id.* ¶ 10.

[33] *Id.*

Although CPL-33 local affiliates, such as Local 1661, are not formal parties to the CBA,[34] they implement the CBA and supplement it with memoranda of understanding or other agreements addressing local concerns.[35] For instance, in recent years Local 1661 negotiated the Overtime Memorandum of Understanding, which outlined procedures management and staff would follow to fill necessary overtime.[36] Local 1661 has also negotiated a supplement to ensure the proper tracking and safe transportation of medications, and safety procedures to protect inmates and staff.[37]

### 3. EO 14,251 and FSLMRS

On March 27, 2025, President Donald Trump signed EO 14,251, which exempted dozens of federal agencies from the requirements of the Federal Service Labor Management Relations Statute ("FSLMRS") because those agencies "had as a primary function intelligence, counterintelligence, investigative, or national security work" and the FSLMRS could not be applied to the agencies "in a manner consistent with national security requirements and considerations."[38] Enacted in 1978, the FSLMRS establishes a framework governing labor-management relations in federal agencies. It provides for collective bargaining between federal agencies and unions, and it bars each from committing unfair labor practices. *See* 5 U.S.C. § 7101, *et seq*. The BOP is one of the agencies that the President sought to exempt from the

---

[34] ECF No. 40-2 ¶ 7.

[35] ECF No. 28-3 ¶ 13.

[36] *Id.* ¶ 6.

[37] *Id.*

[38] ECF No. 1 . ¶ 24; *see also* EO 14,251 § 1(a).

FSLMRS's coverage under EO 14,251.[39] However, EO 14,251 did not state that agencies were compelled to terminate existing CBAs, and it did not mandate that the CBA between CPL-33 and BOP be terminated before its expiration date of May 28, 2029.[40]

The validity of EO 14,251 has been the subject of significant, widespread litigation across the United States.[41]

#### 4. Post-Executive Order, Pre-Termination

Although EO 14,251 was issued on March 27, 2025, BOP did not terminate its CBA with CPL-33 until approximately six months later, on September 25, 2025. For some of the time following the issuance of the Executive Order, the implementation of EO 14,251 was enjoined on First Amendment grounds by the Northern District of California.[42] On August 1, 2025, however, the Ninth Circuit stayed the district court's injunction.[43] Between the date of the Ninth Circuit stay and the CBA termination date, BOP continued to engage in actions required by the CBA.[44]

For example, until the CBA termination date, BOP continued to approve official time for union officials to engage in union activities, notify employees of their right to union representation in disciplinary investigations, and negotiate with CPL-33 on a variety of

[39] ECF No. 1 ¶ 25; *see also* EO 14,251 § 2(b) (listing the Department of Justice, of which BOP is a part, as one of the agencies affected by the Executive Order).

[40] ECF No. 1 ¶¶ 26, 31; *see generally* EO 14,251.

[41] ECF No. 1 ¶¶ 29–36; *see, e.g.*, *AFGE v. Trump*, No. 25-CV-3070, ECF No. 1 (N.D. Cal. Apr. 3, 2025); *U.S. Dep't of Def. v. AFGE, AFL-CIO, Dist. 10*, No. 25-CV-119-ADA, ECF No. 1 (W.D. Tex. Mar. 28, 2025).

[42] ECF No. 1 ¶ 36; *see also AFGE v. Trump*, No. 25-CV-3070, 2025 WL 1755442 (N.D. Cal. June 24, 2025).

[43] ECF No. 1 ¶ 36; *see also AFGE v. Trump*, No. 25-4014, ECF No. 32 (9th Cir. Aug. 1, 2025).

[44] ECF No. 1 ¶ 40.

issues.[45] BOP responded to numerous grievances brought under the terms of the CBA and reached settlements in some outstanding grievances.[46] And it continued to allow CPL-33 to continue working out of BOP office space and kept posters on display that notified employees of their collective bargaining rights.[47]

Local 1661's roles and responsibilities at FCI Danbury also remained the same from the date EO 14,251 was issued on March 27, 2025, until the CBA was terminated on September 25, 2025.[48] During that time, BOP continued to negotiate with Local 1661, attend monthly Labor Relations Meetings, respond to grievances brought by Local 1661 under the CBA, work with Local 1661 to finalize employee rosters under the CBA, and invite the Local 1661 President to meetings.[49] Local 1661 also retained its space at FCI Danbury and access to that space was only revoked a week after the termination of the CBA.[50] Indeed, from March 29, 2025, to September 24, 2025, Local 1661 introduced at least thirty supplements to the CBA, which BOP either reviewed and negotiated or agreed to without any changes.[51]

During this period, the Office of Personnel Management ("OPM") regularly released guidance concerning the termination of CBAs under EO 14,251. In April 2025, OPM issued guidance to all federal agencies in the form of a "Frequently Asked Questions," which advised federal agencies not to terminate collective bargaining agreements in light of the extensive,

---

[45] ECF No. 28-2 ¶¶ 19–21.

[46] *Id.* ¶ 23.

[47] *Id.* ¶ 27.

[48] ECF No. 28-3 ¶ 11.

[49] *Id.* ¶¶ 12–18.

[50] *Id.* ¶ 18.

[51] *Id.* ¶ 13.

nation-wide legal challenges to EO 14,251.[52] After the Ninth Circuit issued its stay, OPM issued revised guidance that stated, "[a]gencies may choose to terminate, abrogate, or repudiate CBAs with other unions, and should consult with their General Counsels to assess next steps regarding those CBAs."[53]

### 5. Termination

In September 2025, Director Marshall "made the decision to terminate the [CBA] with CPL-33 in accordance with the Executive Order."[54] On September 25, 2025, the BOP Deputy Director called CPL-33 President Brandy White to inform her that CPL-33's CBA with BOP was being terminated.[55] Soon thereafter, Ms. White received a letter from Director Marshall (the "Termination Letter"),[56] which stated:

> On March 27, 2025, President Trump signed an executive order (EO) entitled *Exclusions from Federal Labor-Management Relations Programs (Exclusions)*. This order utilized the President's broad authority under 5 U.S.C § 7103(b)(l) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute (FSLMRS). The Department of Justice (other than the United States Marshals Service) was explicitly included in *Exclusions*.
>
> As a result, based on the EO and as of the date of this notice, Bureau of Prisons no longer recognizes the Counsel of Prison Locals, AFGE, as the exclusive representative for employees of the existing bargaining unit. As a result, the following actions, among others, consistent with this decision are being taken:
>
> A. The collective bargaining agreement (CBA) between the Bureau of Prisons (BOP) and the Counsel of Prison Locals (July 21, 2014 – May 28, 2029), and any other negotiated agreements or MOUs between these parties are no longer in effect. Employees will be required to abide by

---

[52] ECF No. 40-2 ¶ 12.

[53] *Id.* ¶ 14.

[54] *Id.* ¶ 15.

[55] ECF No. 28-2 ¶ 28.

[56] *Id.*

> and be regulated by, Component and DOJ policies as well government-wide laws, rules and regulations.
>
> B. Union dues will no longer be deducted from employees' pay or transmitted to you on their behalf.
>
> C. Union officials may no longer request or be granted official time pursuant to the FSLMRS or any CBAs. Any previously approved official time is hereby no longer approved. All employees must report to their currently assigned position of record as of the date of this memo unless they are in an approved leave status.
>
> D. Employees no longer have the right to union representation at formal discussions, investigatory interviews, 3rd party proceedings or in any other situation unless they have a right to a personal representative and choose a union official to represent them in this capacity. Any representative who is also an employee will have to use appropriate leave if they provide representation during work hours.
>
> Any questions regarding this memorandum or other issues should be raised with Christopher Wade, Chief, Labor Relations Office.[57]

The same day Director Marshall sent the Termination Letter, he posted a Message from the Director on the BOP website (the "Director's Message").[58] That message read, in its entirety:

> For too long, the Federal Bureau of Prisons has been ranked among the worst places to work in the federal government. That's unacceptable and that demands change.
>
> My commitment is clear: make life better for every person who works here. Better conditions. Better policies. A better future.
>
> CPL-33 has a proud history of advocating for its members, and I want to acknowledge the positive contributions it has made over the years. Many dedicated people have given their time and energy under this contract, and I respect the intent behind that work. But the truth is, despite those efforts, we have not seen the progress we need. The current contract has too often slowed or prevented changes that would have made your jobs safer and your workdays

[57] ECF No. 28-5 at 2–3.

[58] ECF No. 28-6, at 2–3.

better. This is not about questioning the value of representation; it's about ensuring representation moves us forward, not holds us back.

I grew up in West Virginia. My family has always been pro-union. The coal miners and steel workers I knew stood together, fought for safer conditions, and made life better for their families. That's the kind of union I will always support.

But when a union becomes an obstacle to progress instead of a partner in it, it's time for change. And today, thanks to President Donald J. Trump and Attorney General Pamela Bondi, we're making that change. Today, I'm announcing the termination of our contract with CPL-33 effective immediately.

I want to be absolutely clear about what this means.

- Your job security is protected by civil service law. You will not be removed, suspended, or demoted without cause and due process.

- Your pay and benefits, including your salary, retirement, health insurance, overtime, leave accrual, and uniform allowance, are guaranteed by law and remain.

- Your civil service protections, including whistleblower rights, appeal rights, and anti-discrimination protections, remain fully in place.

- Your safety remains my priority. Our legal obligation to provide a safe and secure workplace does not change.

In the coming days, we will spell out exactly how we move forward from here but the bottom line is CPL-33 didn't give you your protections, the law did, and Bureau policy continues them.

Those safeguards aren't going anywhere. This isn't about taking things away, it's about giving you more. More clarity. More fairness. More respect.

The whole purpose of ending this contract is to make your lives better. Period.

Every time I change an old practice, I'm asking one question first: Does this make life better for my staff? If the answer is no, it doesn't happen. If the answer is yes, we move and we move fast.

We will move forward with solutions that work, without roadblocks, without excuses, and with one goal: to make the Bureau a place where people are proud to serve.

This is our moment to build something better. And we will. Now, let's get to work.

William K. Marshall, III
Director
Federal Bureau of Prisons[59]

As a result of the termination, CPL-33 was no longer recognized as the exclusive representative of BOP staff, and all negotiated agreements between BOP and CPL-33 (and its local chapters) were terminated and no longer in effect, including the CBA.[60]

### 6. Post-Termination

Since terminating the CBA, BOP has taken a litany of actions to unwind its relationship with CPL-33 and Local 1661, and eradicate the protections offered by the CBA. BOP has changed workplace policies to the detriment of employees and forced employees to work overtime in dangerous conditions.[61] Employees have been disciplined and terminated over minor policy violations without due process protections.[62] BOP has prohibited union representatives' use of official time for representing employees in disciplinary proceedings, and in some circumstances, it has also refused to allow union representatives to use their own paid leave to assist employees during those proceedings.[63] For instance, BOP pressured employees not to take sick leave, and in one instance sent a sick-leave abuse letter to an employee who was in the hospital for kidney surgery.[64] In another instance, an employee who

---

[59] *Id.*

[60] ECF No. 40-2 ¶ 15.

[61] ECF No. 28-2 ¶ 30.

[62] ECF No. 28-3 ¶ 19

[63] ECF No. 28-2 ¶ 34.

[64] *Id.* ¶ 31.

Case 1:26-cv-02653-SAG Document 33 Filed 09/30/26 Page 17 of 35

was recovering from surgery was placed on AWOL (Absent Without Leave) status and threatened with termination if they did not return to work.[65] Terminating the CBA stripped BOP employees of the benefit of union representation in these instances, leaving them to navigate disciplinary proceedings without union support.[66]

Without the protections of the CBA, managers at BOP have made changes to schedules, procedures, and performance evaluations without input from CPL-33 or Local 1661.[67] The grievance procedure established under the CBA has been changed to an internal grievance procedure, where BOP adjudicates its own alleged violations without outside oversight.[68] Local 1661, specifically, has noticed that these new work procedures have caused a worsening of working conditions and a noticeable drop in staffing levels.[69] BOP has also changed policies that protected employees without input from CPL-33 or Local 1661.[70] At FCI Danbury, for example, BOP changed the holiday time-off status to require employees to work holidays they traditionally had off.[71] BOP also changed its sick-leave policy at FCI Danbury and now requires employees to provide information about specific medical issues they are experiencing so management can decide if sick leave is appropriate.[72]

[65] *Id.*

[66] ECF No. 28-3 ¶ 19.

[67] *Id.* ¶ 21.

[68] *Id.*

[69] *Id.*

[70] *Id.* ¶ 20.

[71] *Id.*

[72] *Id.*

The elimination of the CBA has also led to BOP restricting union members from advocating for policy before Congress.[73] During the week after the CBA was terminated, BOP prevented CPL-33 representatives from traveling to Capitol Hill to present their views to Congress.[74] BOP denied those members the use of annual leave to travel to Washington, D.C., and threatened to place those who went to Capitol Hill on AWOL status.[75] BOP also prohibited union representatives from speaking with the media, and has reprimanded representatives for speaking to the media on issues such as hardships to its members caused by the federal lapse in appropriations in 2025.[76]

BOP's refusal to allow union representation of employees and its removal of the union office space in its facilities has caused mass confusion among employees as to whether CPL-33 and Local 1661 still exist.[77] This has caused union membership to plummet, and the sharp decrease in membership has threatened the existence of CPL-33 and Local 1661.[78]

**B. Procedural History**

On November 13, 2025, Plaintiffs CPL-33 and Local 1661 filed their complaint, alleging two causes of action: first, that BOP's termination of the CBA between BOP and CPL-33 was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"); and second, that the termination was impermissible retaliation in violation of the First

---

[73] ECF No. 28-2 ¶ 33.

[74] *Id.*

[75] *Id.*

[76] *Id.* ¶ 37.

[77] *Id.* ¶ 30.

[78] *Id.*; *see also* ECF No. 28-3 ¶ 21.

Amendment.[79] The following month, on December 22, 2025, Plaintiffs filed the instant motion for preliminary injunctive relief.[80] Defendants responded to the PI Motion on February 13, 2026,[81] and Plaintiffs replied on April 16, 2026.[82] The Court held oral argument on the PI Motion on April 30, 2026.[83]

## II. LEGAL STANDARD

### A. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking a preliminary injunction that "will affect government action taken in the public interest pursuant to statute or a regulatory scheme" must demonstrate: (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, (3) public interest weighing in favor of granting the injunction, and (4) that the balance of equities tips in its favor. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279–80 (2d Cir. 2021) (quoting *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020)), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021); *see also Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). When the government is a party to the suit, the balance of the equities and public interest factors of the preliminary injunction standard merge. *New York v. U.S. Dep't of*

[79] *See* ECF No. 1.

[80] *See* ECF No. 28.

[81] *See* ECF No. 40. The response was embedded in an omnibus motion to dismiss, a motion to stay, and a response to the PI Motion. *Id.* The Court denied the motion to dismiss and motion to stay on April 28, 2026. *See* ECF No. 54.

[82] *See* Reply, ECF No. 53.

[83] *See* Minute Entry, ECF No. 56.

*Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

A movant seeking injunctive relief has a "heavier burden" than a plaintiff who must plead a "plausible claim necessary to avoid dismissal." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020). Indeed, on preliminary injunction, a court is not required to accept a plaintiff's "allegations as true or draw all reasonable inferences in its favor." *Id.* Rather, "a court may consider the entire record including affidavits and other hearsay evidence." *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018).

### B. 5 U.S.C. § 705

The APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. "The standard for a stay of agency action under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *New York v. Admin. for Child. & Fams.*, 833 F. Supp. 3d 361, 381 (S.D.N.Y. 2026).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiffs' likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). In the PI Motion, Plaintiffs only raised the issue of whether they are likely to succeed on the merits of their claim

that Defendants acted arbitrarily and capriciously in violation of the Administrative Procedures Act ("APA") when terminating the CBA.[84] As explained below, Plaintiffs met their burden of demonstrating that they are likely to succeed on the merits of this issue.

### 1. Claim Channeling and Claim Splitting

As an initial matter, the Court addressed the Defendants' arguments concerning claim channeling and claim splitting in its Order Denying Defendants' Motion to Dismiss (the "Motion to Dismiss Order"). *Nat'l Council of Prison Locs. v. Fed. Bureau of Prisons*, No. 25-CV-1907 (VDO), 2026 WL 1146301, at *4–7 (D. Conn. Apr. 28, 2026). Defendants incorporated the same arguments on these issues in its Motion to Dismiss and Response to the PI Motion.[85] Because the analysis of the likelihood of success on the merits of those claims presents essentially the same legal issues during both the pleading stage and on preliminary injunction, the Court adopts its analysis and decision on those arguments as set forth in the Motion to Dismiss Order. *Id.* For the same reasons, the Court concludes that it is not deprived of subject matter jurisdiction over this matter because: (1) the claims at issue were not channeled to the FLRA; and (2) this matter was not improperly split from the matter in the Northern District of California, *AFGE v. Trump*, No. 25-CV-3070, (N.D. Cal.).

[84] Plaintiffs also state a First Amendment violation claim in their complaint. They did not raise the First Amendment violation in their briefing on the PI Motion, and at oral argument acknowledged their intention to only proceed on the APA claim for the PI Motion. Oral Arg. Tr., ECF No. 62, 21:14–22. Defendants have not objected to this course of action, and accordingly, the Court only considers the merits of Plaintiffs' APA claim in deciding the instant motion.

[85] *See* ECF No. 40-1 at 36 ("For the same reasons set forth above in Sections IV.A.1, IV.A.2, and IV.A.3.a [of the Motion to Dismiss], Plaintiffs are unlikely to succeed on their claim that BOP violated the APA.").

Case 1:26-cv-02653-SAG Document 33 Filed 09/30/26 Page 22 of 35

**2. Administrative Procedures Act**

The Court declined to adjudicate the merits of the APA claim in the first instance in deciding the Motion to Dismiss, finding that, "[t]he Court cannot consider Defendants' fact-specific arguments on the current record, without the benefit of the certified administrative record or the additional breadth of evidence typically available during a preliminary injunction." *Nat. Council of Prison Locs.*, 2026 WL 1146301, at *9. Now, with the benefit of the affidavits and the factual record before the Court on the PI Motion, the Court will address the likely merit of Plaintiffs' APA claim.

Arbitrary-and-capricious review under the APA requires the Court to "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv. Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). "An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (quoting *Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020)). Agency action is also arbitrary and capricious where the agency fails to consider "serious reliance interests" endangered by the change of a longstanding policy. *FDA v. Wages & White*

*Lion Invs., L.L.C.*, 604 U.S. 542, 568–69 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

Plaintiffs make six arguments as to why the termination of the CBA was arbitrary and capricious in violation of the APA: (1) the termination was contrived or pretextual; (2) BOP considered factors that Congress did not permit it to consider in terminating the CBA; (3) BOP failed to consider the discretion it had in deciding whether or when to terminate the CBA; (4) BOP failed to offer a satisfactory explanation for why it terminated the CBA and why it did so at that time; (5) BOP did not consider alternatives to terminating the CBA and it did not consider alternatives to terminating it at that time "effective immediately;" and (6) BOP did not consider the reliance interests of its employees who were impacted by the termination decision and timing.[86]

Defendants offer three arguments in response. First, that Defendants' actions are unreviewable under the APA because they constitute an "agency's action on behalf of the President, involving discretionary authority committed to the President."[87] Second, Defendants argue in the alternative that if the Court finds that the BOP had discretion over whether and when to terminate the CBA, that the Court should find that Plaintiffs are not likely to succeed on the merits of their APA claim because the termination of the CBA is an action "committed to agency discretion by law," and is thus unreviewable under the APA.[88] Third, Defendants

[86] ECF No. 28-1 at 17–22.

[87] ECF No. 40-1 at 23–30 (quoting *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017)).

[88] *Id.* at 29 (quoting 5 U.S.C. § 701(a)(2)).

argue that the termination was not contrived or pretextual because an agency may rationally have multiple reasons for its action.[89]

The Court first considers Defendants' arguments, and finding them unavailing, turns to Plaintiffs' arguments on whether Defendants' termination of the CBA was pretextual, and thus arbitrary and capricious in violation of the APA.

**a. Presidential Action**

Defendants assert in their response to the PI Motion that the decision to terminate is unreviewable under the APA because "[t]he President's determination [to issue EO 14,251] left no room for BOP to make an independent call on ending the CBA."[90]

However, this argument plainly contradicts the factual record and Defendants' concessions that Director Marshall *made the decision* to terminate the CBA, and that he had explicit discretion over *when* to terminate the agreement. Defendants submitted the Declaration of Jonathan Hemingway, the Acting Assistant Director for the Bureau of Prisons Human Resource Management Division, in support of their objection to the PI Motion. There, Mr. Hemingway attests that "the Director of the Bureau of Prisons, William K. Marshall III, *made the decision* to terminate the CBA with CPL-33 in accordance with the Executive Order."[91] At oral argument, Defense counsel elaborated on this point, stating that "the Director had discretion in timing, and there was nothing that said on this specific day you have to terminate the CBA," and that the Executive Order "did not specifically direct Directors to

---

[89] *Id.* at 30–31.

[90] Defs.' Reply, ECF No. 51 at 9.

[91] ECF No. 40-2 ¶ 15 (emphasis added).

terminate CBAs."[92] Indeed, the United States has supported the stance that agencies are free to choose whether and when to terminate CBAs because of the Executive Order. For instance, in the OPM guidance related to EO 14,251, issued after the Ninth Circuit stay (submitted to the Court by Defendants as Exhibit 4 to Hemingway's Declaration), OPM states that "[a]gencies *may choose* to terminate, abrogate, or repudiate CBAs with other unions, and should consult with their General Counsels to assess next steps regarding those CBAs."[93] In February 2026, OPM issued further guidance in the form of a template collective bargaining agreement termination letter (the "OPM Termination Template") which advised agencies to consider a number of interests and weigh whether to terminate CBAs in whole or part.[94] Indeed, throughout that template, OPM advised agencies terminating collective bargaining agreements to state that the agency "reviewed the parties' CBA to determine [whether] continuing to adhere to its provisions would be consistent with the President's national security determination."[95] In doing so, OPM directed agencies to state the specific national security interests impacted by the collective bargaining agreement, and consider "the interests of bargaining unit employees."[96]

On the record before the Court, it is evident that Defendants retained decision-making authority as to whether to terminate the CBA and the timing of such a termination (if any). EO

---

[92] ECF No. 62, at 48:14–17; 50:18–19.

[93] ECF No. 40-6 at 4; ECF No. 40-2 ¶ 14.

[94] *See* OPM Termination Template, https://perma.cc/ZAT4-YAZD; *see also* ECF No. 53 at 8. The Court took judicial notice of this publicly available government document at oral argument. ECF No. 62 at 14:8–18.

[95] OPM Termination Template at 2.

[96] *Id.* at 2–3.

14,251 does not require the termination of collective bargaining agreements. Neither does the section of the FSLMRS that allows the President to exempt agencies from that statutory scheme. *See* 5 U.S.C. § 7103(b). Likewise, the OPM guidance in effect on September 25, 2025, did not require agencies to terminate collective bargaining agreements. Instead, it expressly stated that agencies "may choose" to terminate such agreements. The OPM Termination Template also advised agencies to consider national security concerns and the reliance interests of employees in deciding whether to terminate a collective bargaining agreement. Thus, the termination of the instant CBA was not one that flowed naturally from an executive order leaving Defendants without discretion or flexibility. Rather, Defendants took affirmative steps to decide whether and when to terminate the CBA: in accordance with OPM guidance, Director Marshall "made the decision" to terminate the CBA,[97] and Defendants had the authority to determine when, precisely, the termination was to occur. Those decisions by BOP and Director Marshall are reviewable under the APA. Accordingly, Defendants' argument that the decision to terminate the CBA is unreviewable because they lacked discretion is contradicted by the record, contradicted by other statements made by the United States, and unavailing to this Court.

**b. Discretionary Action**

Defendants argue in the alternative that the APA precludes review because the termination was an action "committed to agency discretion by law," under 5 U.S.C. § 701(a)(2).[98] Specifically, they claim that the Court lacks the authority to review the timing

[97] ECF No. 40-2 ¶ 15.

[98] ECF No. 40-1 at 29.

or affirmative actions taken by Defendants because "[t]here is simply no law" for the Court to apply to determine whether Defendants' actions were arbitrary and capricious in violation of the APA.[99] The Court disagrees with such a broad reading of § 701(a)(2).

The APA carries a "strong presumption that Congress intends judicial review of administrative action." *County of Westchester v. HUD*, 778 F.3d 412, 418–19 (2d Cir. 2015) (quoting *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009)). "The presumption in favor of judicial review is not absolute, but subject to a narrow exception: the APA's prohibition against judicial review of agency action 'committed to agency discretion by law.'" *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016) (quoting 5 U.S.C. § 701(a)(2)). "To honor the presumption of review, [the Supreme Court has] read the exception in § 701(a)(2) quite narrowly, confining it to those rare administrative decisions traditionally left to agency discretion." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020) (cleaned up). Instances of decisions "committed to agency discretion" have included "a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). (cleaned up). "In the absence of an express statutory prohibition, the agency 'bears the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of its decision.'" *Salazar*, 822 F.3d at 75 (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)).

There is no indication that a decision to terminate an agreement such as the CBA is an action solely committed to an agency's discretion by law under § 701(a)(2). First, Defendants

---

[99] *Id.* at 28.

have not demonstrated that, as a matter of tradition, termination of a CBA is a decision committed to agency discretion. This is not a matter where the agency has declined to institute enforcement proceedings, *see Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), or terminated a single employee, *see Webster v. Doe*, 486 U.S. 592, 600–01 (1988). Quite the opposite. This matter is akin to the Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), where the Court found that an agency's decision to eliminate a program offering benefits is not one that is committed to agency discretion by law. *Id.* at 19. Indeed, the recission of such a program "is an action that provides a focus for judicial review," and ensuring "access to these types of benefits is an interest courts often are called upon to protect." *Id.* at 18–19 (cleaned up). Here too, ensuring employment agreements are upheld and employees retain access to their agreed-upon benefits are interests courts are often called upon to protect.

Second, Defendants have not demonstrated that "there is no law to apply" in adjudicating this matter under the APA. Indeed, the District of Rhode Island did not find a shortage of law to apply in deciding a matter with nearly identical facts under the APA, *see AFGE Loc. 2305 v. U.S. Dep't of Veterans Affs.*, No. 25-CV-583, 2026 WL 709856, at *7–9, *7 n.9 (D.R.I. Mar. 13, 2026), and the First Circuit did not indicate that it lacked the caselaw needed to review that decision, *see generally AFGE Loc. 2305 v. U.S. Dep't of Veterans Affs.*, 177 F.4th 1, 12 (1st Cir. 2026) (declining to grant a stay pending appeal of the Rhode Island District Court's decision to grant preliminary injunction). As in those cases, the Court sees no indication that there is "no law to apply" in deciding this matter. Accordingly, Defendants' argument fails because they did not meet the heavy burden of demonstrating that the termination of the CBA was an action committed to agency discretion by law.

**c. Contrived and Pretextual**

The Court next turns to the first of Plaintiffs' six arguments: that Defendants' decision to terminate the CBA was "contrived or pretextual" in violation of the APA because its explanation did not "accurately reflect the reason the agency took the action."[100] As the Supreme Court explained in *Department of Commerce v. New York*, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," but an agency's stated reason for its action must not be "incongruent with what the record reveals about the agency's priorities and decisionmaking process." 588 U.S. 752, 781, 785 (2019).

On September 25, 2025, Defendants published two incongruent explanations for the termination of the CBA. In the termination letter sent to CPL-33 President White, BOP cited the Executive Order as the basis for the termination, stating that the termination was "based on the EO."[101] But that same day, Director Marshall posted his message that heavily criticized CPL-33's operations and stated that the "*whole* purpose of ending this contract" was because the "union [was] an obstacle to progress" and "the current contract has too often slowed or prevented changes."[102] The letter did not state that EO 14,251 required the termination of the CBA. Nor did it mention the national security rationale underlying the Executive Order. Instead, it only cited to Defendants' criticisms of the union. Although an agency may have multiple reasons for its action, it cannot offer an entirely pretextual explanation that is undermined by its own contradictory assertions made the same day. But that is precisely what

[100] ECF No. 28-1 at 18.

[101] ECF No. 28-5 at 2.

[102] ECF No. 28-6 at 2 (emphasis added).

Defendants have done here. They cited the Executive Order as the only basis for cancelling the CBA in the Termination Letter, but issued a public message that same day with an entirely contrary explanation. The Court cannot "ignore the disconnect between the decision made and the explanation given," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), and therefore, Plaintiffs are likely to succeed on their claim that Defendants' decision to terminate the CBA was arbitrary and capricious in violation of the APA.

For the reasons stated in Plaintiffs' memorandum, there are multiple additional and independent reasons why the Government's actions were arbitrary and capricious. At this juncture, however, the Court need only find that it is likely to prevail on one of these arguments.[103] Accordingly, Plaintiffs have met the burden of demonstrating the likelihood of success on the merits of their APA claim.

**B. Irreparable Harm**

Plaintiffs have also demonstrated that they will suffer irreparable harm that could not otherwise be remedied in the absence of a preliminary injunction. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "Where there is an adequate remedy

[103] The Court found it unnecessary to address Plaintiffs' remaining arguments because Defendants did not object to each one independently. *See* ECF No. 40-1 at 25–31, 35–36. Rather, Defendants' response to the remaining five arguments is that the termination of the CBA is unreviewable under the APA, either because it is a presidential action or a matter left to agency discretion. *Id.* Or, that the claims are unreviewable because the court lacks subject matter jurisdiction. *Id.* at 20–25, 35–36. The Court addressed these arguments, *supra*, and found them unavailing.

at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). "[I]rreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Courts in this Circuit have regularly found that a union's "loss of the right to collectively bargain" is "very real" and "irreparable." *See Blyer ex rel. N.L.R.B. v. One Stop Kosher Supermarket, Inc*., 720 F. Supp. 2d 221, 226–27 (E.D.N.Y. 2010); *see also Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 360 (E.D.N.Y. 2012) ("The erosion of support for the Union presents a threat of irreparable harm that justifies injunctive relief."). This is because the Second Circuit has recognized that the loss of union bargaining strength constitutes irreparable harm. *See Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd*., 247 F.3d 360, 369 (2d Cir. 2001). While *Hoffman* concerns the slightly different issue of injunctive relief under the National Labor Relations Act, the principle here is the same: the significant decrease in union membership constitutes irreparable harm because it undermines the existence of the CPL-33 and Local 1661, and their members' ability to collectively bargain.

The termination of the CBA and BOP's resulting actions have caused significant confusion among employees and decrease in union membership, which threatens the existence of CPL-33 and Local 1661. The loss of the members' ability to collectively bargain is causing real and immediate harm that could not be remedied if the Court were to wait until the conclusion of litigation. BOP is using the absence of the CBA to change policies to the detriment of employees, pressure employees not to take leave, and subject employees to discipline and termination without union support or due process protections. BOP has

threatened union representatives with termination to restrict their ability to speak to the media and to Congress. A later ruling could not retroactively restore the union representation that Defendants are actively denying employees or restore the dropping staffing levels and resulting decrease in union membership. Accordingly, the Court concludes that the balance of the evidence weighs in favor of a finding of irreparable harm.

### C. Balance of the Equities and the Public Interest

The final two factors, the balance of the equities and the public interest, also weigh in favor of granting a preliminary injunction. The Court considers these two factors in unison, as they merge when the Government is an opposing party. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025).

Plaintiffs argue that the balance of the equities and public interest support reinstating the CBA because they are experiencing a significant burden in the form of membership loss, and because their members are losing the range of protections they negotiated for (and are entitled to) under the CBA.[104] They also assert that preventing these harms "provides a significant public benefit," as CPL-33 and its locals ensure safety for BOP staff and the inmates housed at its facilities.[105] Plaintiffs also reference the statutory mandate declared by Congress in 5 U.S.C. §§ 7101(a)(1)(A)–(B), that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing . . . safeguards the public interest" and "contributes to the effective conduct of public business."[106] Defendants, in opposition, claim this balance falls in their favor because: (1)

---

[104] ECF No. 28-1 at 25.

[105] *Id.* at 26.

[106] *Id.*

Case 1:26-cv-02653-SAG Document 33 Filed 09/30/26 Page 33 of 35

reinstating the CBA would frustrate the President's national security rationale for excluding BOP from the FSLMRS, and (2) the BOP has already taken steps to implement EO 14,251.[107]

The Court cannot afford Defendants first point much weight because, as discussed above, it is evident that national security was not the basis for this termination. A determination on whether reinstating a CBA frustrates the national security rationale underlying EO 14,251 is an argument more appropriately made in one of the numerous cases addressing the validity of that Executive Order. As to Defendants' second point, the Court recognizes that reinstating the CBA will pose a burden on Defendants' resources. But this burden is significantly outweighed by the interests articulated by Plaintiffs. *See AFGE Loc. 2305*, 2026 WL 709856, at *11 (determining that "the significant injury to the Plaintiffs from the loss of status as representatives . . . and to their members from the revocation of the protections and benefits of the Master CBA weighs more heavily" than the burden on an agency in reinstating a collective bargaining agreement). It is also evident that "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (cleaned up). As the Court has found that Defendants' actions likely violated the APA, there is no public interest in allowing them to continue with their course of action. Accordingly, the balance of the equities and the public interest weigh in favor of granting preliminary injunctive relief.

**D. Bond**

As Plaintiffs have met their burden of demonstrating every element necessary for a preliminary injunction, the Court turns to the issue of whether they should be required to post

[107] ECF No. 40-1 at 39–40.

Case 1:26-cv-02653-SAG Document 33 Filed 09/30/26 Page 34 of 35

a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. Defendants request an $8,750,000 bond in the event the Court enjoins the termination of the CBA, claiming it "would be the minimum amount needed to cover the BOP's costs and damages for one year should it be found that Defendants were wrongfully enjoined."[108] Plaintiffs, in response, ask the Court to waive the requirement of a bond, arguing that a bond in the amount requested by Defendants "would have 'a chilling effect' on the union and its members from seeking to vindicate their rights."[109]

Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *New York v. Admin. for Child. & Fams.*, 833 F. Supp. 3d 361, 404 (S.D.N.Y. 2026) (cleaned up). "A bond is not necessary where requiring one would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Id.* (cleaned up).

In harmony with the other courts that have decided similar cases concerning EO 14,251, the Court will only require Plaintiffs to post a nominal bond. *See AFGE Loc. 2305*, 2026 WL 709856, at *11 (requiring a $1,000 bond); *AFGE, AFL-CIO v. OPM*, 781 F. Supp. 3d 920, 942 (N.D. Cal. 2025) (requiring a $1 bond per plaintiff). The Court sees no reason to depart from the practice of its sister courts. And requiring Plaintiffs to post a bond in the range of millions

---

[108] ECF No. 40-1 at 41; *see also* ECF No. 40-2 ¶ 22.

[109] ECF No. 53 at 11–12.

of dollars would effectively deny their right to judicial review of an administrative action. Therefore, Plaintiffs are **ordered** to post a nominal bond in the amount of $1,000.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction and preliminary relief under 5 U.S.C. § 705 is **GRANTED**. Defendants shall immediately reinstate the CBA, as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the CBA, for the remainder of the agreed-upon term provided in the CBA.

**SO ORDERED.**

Hartford, Connecticut
September 29, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge